**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **Cynthia Marie IVEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:09-CV-333 (MTT)** |
| ) | |
| **FIRST QUALITY RETAIL SERVICES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER</u>

This matter is before the Court on the Defendant's Motion for Summary

Judgment (Doc. 27) (the "Motion").  For the following reasons, the Motion is **GRANTED**

on all claims.

## I.      FACTUAL BACKGROUND

Plaintiff Cynthia Ivey was hired by the Defendant, a manufacturer of disposable

diapers, as an entry-level Product Technician on August 30, 2004.[1]  Product

Technicians work in four- to five-member teams rotating tasks in packaging operations

or material handling operations.  According to the job description,[2] Product Technicians

spend 2/3 of their time lifting up to ten pounds and over 2/3 of their time lifting up to 25

---

[1] The company was known as Tyco International Ltd. when the Plaintiff was hired.  In 2007, Tyco's healthcare division became an independent company named Covidien Ltd.  In April 2008, First Quality acquired Covidien Ltd.'s Retail Products business and it became First Quality Retail Services, LLC.  First Quality – Companies, First Quality Retail Services (FQRS), http://www.firstquality.com/x462.php (last visited May 3, 2011).

[2] The job description was created after the Plaintiff began working.  The Plaintiff testified that the speed of the diaper-dispensing machine was missing from the job description, but she regarded it as an accurate description with regard to the physical demands.

and 50 pounds.[3]  (Doc. 29, Exhibit 28).  The job description also states that Product Technicians spend 2/3 of their time using their hands to "finger, handle, and feel."  *Id*. The frequency of hand movements depends on the speed of the machine.

Product Technicians alternate between three- and four-day workweeks at twelve hours per day.  Product Technicians may not leave the packaging area while the diaper dispensing machine is running, but may leave during their 20 minute morning break, 30 minute meal break, or 20 minute evening break.

On May 8, 2007, the Plaintiff notified the assistant manager for human resources and the safety manager that she was experiencing wrist and hand pains.  Thereafter, a doctor provided the Plaintiff with a metal wrist brace.  The Plaintiff did not want to use the brace because she said it made her job unsafe by violating the no-jewelry policy, was uncomfortable, and led to name-calling by coworkers.[4]

On July 27, 2007, Dr. John Sapp, the company doctor, performed carpal tunnel release surgery on the Plaintiff's right wrist.  Although Dr. Sapp did not perform surgery on the Plaintiff's left wrist, he did inject it with a steroid.  The Plaintiff was given several weeks off work to recover from the surgery.

The Defendant has a policy of temporarily allowing employees to perform "light duty" work until they can return to their regular activities.  When the Plaintiff returned to work in September 2007, she was assigned to light duty work including, but not limited

---

[3] In this regard, the job description does not make sense.  Product Technicians cannot spend 2/3 of their time lifting up to 10 pounds, over 2/3 of their time lifting up to 25 pounds, and over 2/3 of their time lifting up to 50 pounds.  The point is lifting and repetitive hand use were essential functions of the Product Technician position.

[4] The Plaintiff appears to raise a hostile work environment claim in her Response.  Because the Complaint did not contain this claim, the Court will not consider it.  *Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999).

to, "swe[eping] a lot of floors" and doing paperwork. (Doc. 29, at 26). The Plaintiff also worked in the hole (the front of the machine) while on light duty and claims she "did everything in the hole except package the diapers," such as load bags and pick diapers up off the floor. *Id.* Temporary workers packaged in the hole while the Plaintiff was on light duty.

Despite her light duty assignment, the Plaintiff claims the safety manager did not consider her preferred accommodation, which was a platform for short employees. The platform allegedly would have eliminated some of the pressure on her hands.

Notwithstanding her surgery and light duty assignment, the Plaintiff claims she was still in pain. In October 2007, Dr. Sapp recommended that the Plaintiff undergo surgery on her left wrist. However, the Plaintiff refused to have surgery performed at that time because she was still recovering from the first surgery.

On February 22, 2008, the Defendant informed the Plaintiff that she would be placed on occupational-injury leave of absence beginning February 25, 2008. A letter dated March 27, 2008, clarified that she was placed on leave of absence because, according to the most recent work status report from her treating physician,[5] the restrictions on her left wrist were permanent. A letter dated April 8, 2008, informed the Plaintiff that although her Family and Medical Leave Act time was exhausted,[6] she would continue to be employed by the Defendant. The Plaintiff was informed her medical, dental, vision, life, and disability insurance benefits would be continued until

---

[5] There is no work status report in the record between November 7, 2007 and March 4, 2008. The November 7 work status report states that the Plaintiff could return to work subject to certain restrictions. The March 4 work status report states that, at the time, the Plaintiff was unable to do any type of work and was temporarily totally disabled.

[6] The Plaintiff disputes that she exhausted her 12-week FMLA leave.

August 31, 2008.  Upon return, the Plaintiff would be restored to her original job or an equivalent job.  The letter further notified the Plaintiff that she would be terminated if she could not return to her pre-injury job by August 25, 2008.  Pursuant to company policy, "failure to return to work on your company-scheduled return date could result in termination, unless you have received company approval for an extension prior to the expiration of the original leave period."  (Doc. 27-3, Exhibit 3).

On April 24, 2008, the Plaintiff wrote the Equal Employment Opportunity Commission claiming she had been discriminated against.  The Plaintiff filed a charge of discrimination with the EEOC on or about May 21, 2008.

The Plaintiff petitioned for a change of doctors and began seeing a new workers' compensation doctor in June 2008.  The Plaintiff's new doctor did not find permanent restrictions on her hands and, according to the Plaintiff, said she could perform the essential functions of the job with or without reasonable accommodation.

On September 15, 2008, the Defendant notified the Plaintiff that she needed to request an extension or provide a medical release demonstrating her ability to perform the essential functions of her job either with or without some reasonable accommodation as well as a definitive return-to-work date.  The Plaintiff was warned that she would be removed from the "active roles" if she did not provide this information.  (Doc. 27-3, at 13).  On October 2, 2008, the Plaintiff responded with a letter informing the Defendant she could return to work if an accommodation was made, such as rotating hand uses every fifteen minutes,[7] providing her with a step platform, or

---

[7] The Plaintiff clarified in her Deposition that she sought a five-minute break for every fifteen minutes worked to rest her hands.

reassigning her to another position.  The correspondence included the Treatment and Work Status Report of the Plaintiff's new workers' compensation doctor, which limited the Plaintiff to light work intensity (10-20 pounds) for an infrequent period (0-2% of the time or up to 50 times).[8]

The Defendant responded to the Plaintiff's letter and stated that her position requires hand use "far more times than the restriction portions of the report seems to allow."  (Doc. 27-3, at 16).  The Defendant offered to accommodate the Plaintiff by granting her a leave of absence to have surgery performed on her left wrist.  The Plaintiff declined this accommodation and the Parties exchanged letters and work status reports until the Plaintiff sent a letter notifying the Defendant that she would return to work in January.

On January 9, 2009, the Plaintiff met with human resources personnel and the safety manager to discuss her current medical condition and her work status report dated November 19, 2008.  The Defendant claims there were no available positions for someone with the Plaintiff's limitations and terminated the Plaintiff January 19, 2009.

In April 2009, the Plaintiff filed a second charge of discrimination.  The Plaintiff filed this action September 21, 2009.

## II.    DISCUSSION

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed.

---

[8] The work status report also states that the Plaintiff had occasional hand use (3-33% of the time or 51 to 250 times) for overhead and forward reach, but the Plaintiff did not suggest rotating these as accommodations in her letter.

R. Civ. P. 56(c). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material facts exists. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224. The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." *Id.*

A. Substantive ADA Provisions

The Americans with Disabilities Act prohibits discrimination against a qualified individual on the basis of disability. 42 U.S.C. § 12112(a). The burden-shifting analysis of Title VII employment discrimination cases also applies to ADA claims. *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). To establish a prima facie case of discrimination, the Plaintiff must prove by a preponderance of the evidence she "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability." *Id.*

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Plaintiff bears "the burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job" as well as "the ultimate burden … with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000). Plaintiffs "need only show that an

'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases."

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

To determine the essential functions of the job, courts consider "the employer's judgment as to what functions of a job are essential and the employer's written description for that job." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). Factors that also may be considered include:

> (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs.

*Id.*

An employer is only required to provide an accommodation that is reasonable and is "not required to accommodate an employee in any manner in which that employee desires." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Reasonable accommodations may include job restructuring, reassignments, modification of equipment or devices, or "other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal functions*, employers are not required to transform the position into another one by eliminating functions that are *essential to the nature of the job* as it exists." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) (emphasis added).

Here, the parties do not dispute that the Plaintiff was disabled at the time of the alleged discrimination. However, the parties do dispute whether the Plaintiff was a qualified individual. It is clear that lifting and repetitive hand use were essential functions of the Product Technician position. The Plaintiff clarifies that she did not always lift boxes once they were packaged, but it is undisputed that she had to lift diaper bags to get them into boxes for packaging. Also, even though employees would perform fewer hand movements when packaging from slower machines, it is clear the Product Technician position required repetitive hand use. The questions, then, are whether there was an accommodation that would allow the Plaintiff to perform the essential functions of the job and whether such an accommodation would be reasonable.

The Defendant offered to accommodate the Plaintiff's disability by extending medical leaves and benefits to have surgery performed on her left wrist, but the Plaintiff refused to undergo the procedure. Alternatively, the Defendant requested a medical release stating she could perform the essential functions of the job with or without reasonable accommodation. The Plaintiff rejected the Defendant's accommodation and never sent a medical release. Instead, the Plaintiff preferred the following accommodations: rotating hand uses every fifteen minutes and resting five minutes; light duty; reassignment to the Quality Department; and utilizing a $60 step platform.

Assuming that corrective surgery is not a reasonable accommodation, the Plaintiff has not shown a reasonable accommodation that would allow her to perform the essential functions of her job. With regard to rotating uses, the Plaintiff attempts to prove she could continue working in the hole by referencing the Defendant's policy of

limiting diaper packaging to one hour at a time.  The Plaintiff believes that based on the work status reports, she should have been able to work fifteen minutes and rest five.

However, there is no evidence a modified schedule would have allowed the Plaintiff to perform the essential functions of the job.  The Plaintiff claims she could rotate hand uses every fifteen minutes and take a five minute break, but no doctor ever approved this accommodation.  Rather, the work status reports limit her five proposed hand uses to 0-2% of the time or 1 to 50 times.  The work status reports are consistent with the Plaintiff's statement that she did not have the strength to open a jar, peel a potato, or control tongs at a salad bar (Doc. 30, at 8).  Moreover, the job required repetitive hand use and the Plaintiff conceded that the job required "a lot more repetitious type work than [her] doctor was saying that [she] could do…."  (Doc. 29, at 57).  The Plaintiff also could not identify another worker who was able to work fifteen minutes and rest five.  Because there is no evidence rotating hand uses would enable the Plaintiff to perform the essential functions of the job, no reasonable jury could find the Plaintiff was a qualified individual.

To the extent the Plaintiff argues the Defendant should have permanently kept her on light duty because they offered it as a temporary accommodation,[9] the Plaintiff misundersatnds what the ADA requires.  Employers are not required to create light duty positions for disabled employees to comply with the ADA unless the "heavy duty" tasks are marginal functions which may be reallocated to co-workers.  Equal Employment Opportunity Commission, Technical Assistant Manual on ADA § 9.4.  "If the position was created as a temporary job, a reassignment to that position need only be for a

---

[9] The Complaint lists her inability to perform light duty work as a basis for her discrimination claim.

temporary period." *Id.* However, plaintiffs may still prevail if they can identify a vacant light duty position for which the injured worker is qualified. *Id.*

Here, the employer created a light duty assignment, but only intended for it to be temporary. The Plaintiff argues that temporary workers could have continued to be used, but lifting and repeated hand use are essential functions of the Product Technician position and the Defendant is not required to reallocate these functions. The Plaintiff also does not allege that there were any available light duty positions when she was placed on leave of absence. The Plaintiff identified one man with burned hands who was assigned to paperwork for light duty, but she did not know whether he still works with the company or if he was employed when she was placed on leave of absence. Because the Defendant did not have to permanently place the Plaintiff on light duty, no reasonable jury could find the Defendant violated the ADA.

The Plaintiff also argues she could have been reassigned to the Quality Department, but does not state whether there were availabilities in that department.[10] While the ADA lists a reassignment as a reasonable accommodation, the statute does not require an employer to promote the disabled employee, reassign the employee to an occupied position, or create a new position. *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998). Employers must only provide "'alternative opportunities reasonably available under the employer's existing policies.'" *Id.* at 627 (quoting *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 289 n.19 (1987)). Here, the Plaintiff does not present any evidence of any vacancies within the Quality Department. Thus, no

---

[10] The Plaintiff does not name a position other than the Quality Department to which she could have been reassigned.

reasonable jury could conclude reassignment to the Quality Department was a reasonable accommodation.

The Plaintiff also claims a $60 step platform would have allowed her to perform the essential functions of her job by taking some pressure off her hands in the hole. There is no question that it would be reasonable for an employer to accommodate a disabled employee with a $60 step platform. Therefore, the real question is whether the platform would actually accommodate the Plaintiff. The Plaintiff does not provide any evidence that a step platform would have actually enabled her to perform the essential functions of the job. Dr. Sapp believed the Plaintiff would not be able to return to work until she had surgery performed on her left wrist. At one point, the Plaintiff was diagnosed as unable to do any type of work and temporarily totally disabled. Even the work status reports from the Plaintiff's new doctor cast serious doubt on the Plaintiff's preferred accommodation because it states that she could use her hands only 0-2% of the time. Because there is substantial evidence that the Plaintiff's use of her hands was severely limited, the employee has not created a genuine issue of material fact whether a step platform would accommodate her disability.[11]

Accordingly, because no reasonable jury could find the Plaintiff established a prima facie case of discrimination pursuant to 42 U.S.C. § 12112(a), the Motion should be granted.

B. Retaliation Pursuant to the ADA

---

[11] Because the Plaintiff has not proven she is a qualified individual, there is no need to address her argument that the Defendant discriminated against her by forcing her to take a leave of absence, attaching conditions to her return to work, and terminating her.

Even if a plaintiff does not prevail on the underlying claim of discrimination, she may recover for retaliation. It is unlawful for an employer to discriminate against an employee for participating in an ADA investigation. 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation in violation of the ADA, a plaintiff must establish that (1) she engaged in statutorily protected expression; (2) she was subsequently subjected to a materially adverse action; and (3) there was a causal link between the materially adverse action and her protected expression. *Cox v. City of Tampa*, 2011 WL 989807, at *1 (11th Cir. 2011).

The Defendant concedes that the Plaintiff has satisfied the first two prongs, but argues there is no causal link between the materially adverse action and her protected expression. The Defendant's stance is consistent with Eleventh Circuit precedent. Even a three month period between the materially adverse action and protected expression is insufficient to establish a causal connection. *Hidgon v. Jackson*, 393 F.3d 1211, 1220-21 (11th Cir. 2004). Here, the Plaintiff filed her first charge of discrimination May 21, 2008. The Plaintiff was terminated nearly eight months later on January 19, 2009. There is no question that this temporal proximity, by itself, is too remote to satisfy the causal connection prong. Moreover, the Plaintiff knew before she filed her first charge that she was being placed on six-month occupational-injury leave of absence and she would not be able to return to work unless she could perform the essential functions of the job with or without reasonable accommodation. Further, the Defendant extended deadlines to allow the Parties to reach an agreement that would allow the Plaintiff to keep her job.

Accordingly, because no reasonable jury could find the Plaintiff established a prima facie case of discrimination pursuant to 42 U.S.C. § 12203(a), the Motion should be granted.

### III.    CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** on all claims.

**SO ORDERED**, this the 3rd day of May, 2011.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT